**William C. LEWIS, Plaintiff–Appellant,**

v.

**ACB BUSINESS SERVICES, INC.,**
Defendant–Appellee (96–3093/3498),

**American Express Travel Related Services Company, Inc.; James P. Connors, Defendants–Appellees (96–3498).**

Nos. 96–3093, 96–3498.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 28, 1997.

Decided Jan. 30, 1998.

Jason D. Fregeau (argued and briefed), Yellow Springs, OH, for Plaintiff–Appellant.

James Patrick Connors (argued and briefed), Columbus, OH, for Defendants–Appellees.

Before: CONTIE, RYAN, and BOGGS, Circuit Judges.

BOGGS, J., delivered the opinion of the court, in which CONTIE, J., joined. RYAN, J. (pp. 413–16), delivered a separate dissenting opinion.

## OPINION

BOGGS, Circuit Judge.

The two actions involved in this appeal arose out of William C. Lewis's credit relationship with American Express Travel Related Services Company, Inc. ("Amex"). Lewis owes a substantial sum of money to Amex for charges he made on his Gold Card. After he stopped making payment, Amex hired ACB Business Services, Inc. ("ACB") to collect on the debt. These events led to the filing of three lawsuits, two by Lewis and one by Amex. At issue in this appeal are the two suits filed by Lewis. Because these suits are closely related, we deal with both in this opinion. The first suit was filed by Lewis in the Southern District of Ohio, Western Division at Dayton ("the Dayton case"). In this suit, Lewis alleged that ACB's collection efforts violated the Fair Debt Collection Practices Act ("FDCPA") and the Ohio Consumer Sales Practices Act ("OCSPA"). A jury trial was held, and at the conclusion of all the evidence, the court granted ACB's motion for judgment as a matter of law.

After the Dayton case had been filed, Amex sued Lewis in state court to recover the unpaid balance on the Gold Card. Lewis then filed suit in the Southern District of Ohio, Western Division at Cincinnati ("the Cincinnati case"). In this second action,

Lewis alleged that ACB, Amex, and James P. Connors had filed the state court action in retaliation for Lewis having filed the Dayton case. He claimed that this violated the FDCPA, the OCSPA, and the Equal Credit Opportunity Act ("ECOA"). Amex and ACB moved to dismiss Lewis's complaint and Connors moved to strike the complaint against him. The district court granted defendants' motions. Lewis now appeals the judgments against him in both cases. We affirm.

## I

Lewis does not dispute that he ran up thousands of dollars in debt on his Amex Gold Card during 1992.[1] Amex hired ACB to collect this debt. Prior to the commencement of ACB's collection efforts, Lewis had negotiated with Amex over the debt and became upset when the account was referred to ACB for collection.

ACB's collection efforts began in February 1993. On March 1, 1993, Lewis sent a letter to ACB, requesting that ACB cease communications in accordance with 15 U.S.C. § 1692c.[2] At issue on this appeal are two contacts ACB made after Lewis sent this letter: (1) a letter ACB sent to Lewis on June 3, 1993, and (2) a telephone call placed by ACB to Lewis on July 8, 1994.[3]

### A. *The June 3, 1993 letter*

On June 3, 1993, ACB sent a letter to Lewis. The letter states in relevant part:

---

1. At the time the June 3, 1993, collection letter was sent, Lewis owed Amex $14,429.54. At that same time, Lewis was also heavily in debt to other debt collectors and creditors in the amount of approximately $50,000.

2. The FDCPA allows a consumer to notify a debt collector in writing that he "wishes the debt collector to cease further communication with the consumer." 15 U.S.C. § 1692c(c). This makes collection efforts more difficult for the debt collector. However, the Act does not require a debt collector to cease all collection efforts. *See* 15 U.S.C. § 1692c(c)(1)-(3); *see also* 398–400, *infra*.

3. Lewis advanced several other claims of FDCPA violations. These claims, however, are not at issue on appeal. Nonetheless, because Lewis

uses facts relevant to these claims to advance some of his arguments on appeal, we briefly set forth those claims. Lewis alleged that ACB violated the FDCPA when it sent a collection letter on February 23, 1993, which asked Lewis to call ACB but did not mention in the letter the writing on the reverse side that spelled out the consumer's rights, including the right to obtain verification of the debt under 15 U.S.C. § 1692g. This claim was dismissed by the district court because it was barred by the one-year statute of limitations and because Lewis had proved no damages proximately caused by the alleged violation. Lewis also claimed that ACB violated the FDCPA when it tried to contact his neighbors and Holly Phillips, a supplemental card holder, regarding the debt. This claim was dismissed by the district court as being outside the pleadings.

YOUR ACCOUNT HAS BEEN TRANS-FERRED TO MY OFFICE FOR FINAL REVIEW.

IN A PERCENTAGE OF CASES, I FIND THAT PAYMENT ARRANGE-MENTS MAY NOT HAVE BEEN OF-FERED BY OUR AFFILIATED OF-FICE. IN ORDER TO PROVIDE YOU WITH AN OPPORTUNITY TO PAY THIS DEBT, PLEASE SELECT ONE OF THE FOLLOWING PAYMENT AR-RANGEMENTS AND ENCLOSE PAY-MENT, OR PROVIDE ME WITH A NUMBER WHERE I CAN CONTACT YOU TO DISCUSS TERMS.

. . . .

IT IS IMPORTANT THAT ARRANGE-MENTS BE MADE AS SOON AS POS-SIBLE.

IF YOU HAVE ANY QUESTIONS RE-GARDING THE PAYMENT PLANS, GIVE ME A CALL OR PROVIDE ME WITH A NUMBER WHERE I CAN CONTACT YOU. FOR YOUR CONVE-NIENCE, I CAN ARRANGE FOR YOU TO PAY YOUR ACCOUNT USING VISA AND/OR MASTERCARD.

　　CONTACT: M. HALL

　　PAYMENT SUPERVISOR

　　(800) 767–5971

THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OB-TAINED WILL BE USED FOR THAT PURPOSE.

YOUR ACCOUNT BALANCE MAY BE PERIODICALLY INCREASED DUE TO THE ADDITION OF ACCRUED IN-TEREST OR OTHER CHARGES AS PROVIDED IN YOUR AGREEMENT WITH YOUR CREDITOR.

Although the letter indicates that Lewis should contact "M. Hall," no such person existed at ACB. Nor was the alias "M. Hall" assigned to any one person there. The evi-dence showed that "M. Hall" was a name used by ACB to alert its employees regard-ing the status of the account. The evidence also showed, however, that a specific repre-sentative had been assigned to Lewis's ac-count. ACB attempted no further contact relating to this letter, and after the letter had been sent, ACB returned Lewis's ac-count to Amex. It was not until Lewis initi-ated suit in the Dayton case that the account was returned to ACB.[4]

## B. *The July 8, 1994 telephone call*

When Amex returned the account to ACB, Amex miscoded the account as a new refer-ral, rather than a reopening. Thus, it ap-peared in ACB's computer system as a new account. Based on this miscoding, an initial collection letter was generated by ACB. Al-though the letter was never sent, an initial contact call, lasting approximately one min-ute, was made to Lewis on July 8, 1994, before the mistake was caught by ACB.

Janet Schohan, one of ACB's FDCPA com-pliance officers, discovered ACB's mistake after arriving at work in Phoenix. She was able to stop the letter from being sent, but the telephone call had already been placed because of the three hour time difference between the Phoenix and New Jersey of-fices.[5] When Schohan learned of the error, she immediately terminated all collection ac-tivity and ACB took no further action on the account.

During discovery in the Dayton case, Lew-is moved to compel ACB to produce "the balance of its contract with Amex," because he claimed that it controlled ACB's collection activities with respect to his account.[6] The court denied the request, finding that any contract between ACB and Amex had no relevance to the issue of whether ACB's col-lection efforts violated the FDCPA or the OCSPA.[7]

---

4. The account was returned to ACB in accor-dance with a policy between ACB and Amex pursuant to which accounts are returned to ACB when a disgruntled debtor files a lawsuit against it so that ACB has the necessary information to defend the suit.

5. The file had been sent to the New Jersey office because of the miscoding.

6. Lewis moved to compel discovery of only the balance of the contract because he already had a portion of the contract in his possession.

7. Lewis never requested discovery of this docu-ment in the Cincinnati case.

Meanwhile, on October 14, 1994, before trial in the Dayton case, Amex filed suit against Lewis in Franklin County Common Pleas Court ("the state court action") to recover the unpaid balance on the Gold Card. Amex is represented in that case by Connors, who is also ACB's trial attorney in the Dayton case, as well as the trial attorney and a defendant in the Cincinnati case. As a result of Amex suing Lewis in state court, Lewis filed the Cincinnati case on March 27, 1995, shortly before the trial was originally scheduled to take place in the Dayton case. The two cases were consolidated at Lewis's request. He then tried to have venue of both cases transferred from Dayton to Cincinnati. The trial court consolidated the cases, but declined Lewis's request for change of venue. The Dayton case therefore remained before Magistrate Judge Merz for all purposes, the parties having agreed to plenary magistrate judge jurisdiction in that case pursuant to 28 U.S.C. § 636(c), and the Cincinnati case remained on Magistrate Judge Merz's docket for pretrial purposes only (since Lewis had specifically declined plenary magistrate judge jurisdiction in that case). The district court cited Lewis's attempt at forum shopping and the district's local rule for hearing consolidated cases in the venue in which the first case is filed as reasons for refusing the change in venue.

Lewis also made a motion to bring new claims in the Dayton case just before the trial was supposed to start. He contended that the new claims were necessary because they arose after Amex had returned his account to ACB on July 8, 1994. The district court granted Lewis's motion to amend the complaint and vacated the Dayton case trial date set for May 8, 1995. ACB sought reconsideration of this order, but its motion was denied.

A jury trial in the Dayton case was held on January 9 and 10, 1996, before Magistrate Judge Merz. At the conclusion of Lewis's proof, the court granted in part and denied in part ACB's Fed.R.Civ.P. 50 motion for judgment as a matter of law. At the conclusion of all the evidence, the court denied Lewis's motion for judgment as a matter of law and

granted ACB's cross-motion, thus eliminating all remaining allegations against ACB.

In the Cincinnati case, Mr. Lewis alleged that Amex, ACB, and Connors had used the state court action to retaliate against him because he had filed suit against ACB. He claimed that when Amex brought the state court action it, as well as ACB and Connors, violated the FDCPA, the OCSPA, and the Equal Credit Opportunity Act ("ECOA"). Amex and ACB moved to dismiss Lewis's complaint and Connors moved to strike the complaint against him. Because the parties presented matters outside the pleadings, Connors's motion was treated as one for summary judgment. After hearing argument, Magistrate Judge Merz filed a report and recommendation regarding the various motions. He recommended that Connors's motion for summary judgment be granted on the ground that Connors was not a debt collector as a matter of law. The magistrate judge also recommended that Lewis's remaining claims be dismissed for failure to state a claim. In addition, he denied Lewis's motions to strike and for a change in venue. District Judge Spiegel adopted the magistrate judge's report and recommendations.

On appeal, Lewis raises numerous claims of error. In the Dayton case, he argues that the district court erred in (1) granting ACB's motion for judgment as a matter of law on Lewis's FDCPA claims; (2) denying Lewis discovery of an agreement between Amex and ACB; and (3) granting ACB's motion for judgment as a matter of law on Lewis's OCSPA claims. In the Cincinnati case he claims that the district court erred in (1) dismissing his ECOA claim; (2) granting Connors's motion for summary judgment based solely on his affidavit; (3) finding that ACB did not illegally interpose itself between Connors and Amex; (4) finding that Amex is not a debt collector as defined by the FDCPA; (5) dismissing with prejudice Lewis's OCSPA claims; and (6) denying his motion to reconsider its decision declining to transfer venue back to Cincinnati. We address the issues in the order presented.

## II

Lewis raises three claims of error in the district court's order granting ACB's motion

for judgment as a matter of law on Lewis's FDCPA claims in the Dayton case: (1) that the June 3rd collection letter was a further communication in violation of 15 U.S.C. § 1692c(c); (2) that the June 3rd collection letter's use of the pseudonym "M. Hall" was a violation of 15 U.S.C. § 1692e(10); and (3) that ACB failed to prove the bona fide error defense with respect to the July 8th telephone call.

Motions for judgment as a matter of law are reviewed de novo. We do not weigh the evidence, evaluate the credibility of witnesses, or substitute our own judgment for that of the jury. Rather, this court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences. *See O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir.1994). We must affirm the district court if we are convinced that "there is a complete absence of pleading or proof on an issue or issues material to the cause of action or where there are no controverted issues of fact upon which reasonable men could differ." *Ibid.* (internal quotation omitted).

## A. *The June 3rd collection letter as a remedy*

Lewis argues first that the district court erred in holding the June 3rd letter to be a permissible communication under 15 U.S.C. § 1692c(c)(2), even though sent after his demand to desist, because it is a notice of specified potential remedies ordinarily invoked by ACB. He argues that the Federal Trade Commission's statement of general policy on the FDCPA, which indicates that a "debt collector's response to a 'cease communication' notice from the consumer may not include a demand for payment, but is limited to the three statutory exceptions," 53 Fed. Reg. 50097, 50104 (Dec. 13, 1988), is dispositive because language in the letter indicates that it is a demand for payment couched as a remedy. While Lewis's argument is not wholly without merit, we cannot agree with his interpretation of § 1692c(c) because such an interpretation would be contrary to the purpose of the Act.

15 U.S.C. § 1692c(c) provides that "[i]f a consumer notifies a debt collector in writing that the consumer . . . wishes a debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt." The statute, however, permits the collector to make further communication with the consumer under three limited circumstances. One of those circumstances allows the debt collector "to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor." 15 U.S.C. § 1692c(c)(2). We believe that the June 3rd letter fits within § 1692c(c)(2).

Congress enacted the FDCPA to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). Congress intended the Act to eliminate unfair debt-collection practices, such as late-night telephone calls, false representations, and embarrassing communications. The Senate Report justified the need for legislation by stating:

> Collection abuse takes many forms, including obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights, disclosing a consumer's personal affairs to friends, neighbors, or an employer, obtaining information about a consumer through false pretense, impersonating public officials and attorneys, and simulating legal process.

Sen. Rep. No. 382, 95th Cong., 1st Sess. 2 (1977), reprinted in 1977 U.S.C.C.A.N. 1695, 1696.

While Congress appears to have intended the act to eliminate abusive collection practices, the language of § 1692c(c) is broader: it not only states that a debt collector may not make a demand for payment following a cease-communication letter, but also prohibits communication of any kind other than those falling within the three exceptions.

Thus, at first glance, ACB's June 3rd letter does not appear to fall within the literal terms of § 1692c(c)(2) as a notice of remedy. A close look at the letter, however, shows that the letter can be construed as a type of settlement offer and that ACB normally invokes such a remedy. We believe that such a construction is warranted.

We believe that Lewis's interpretation of § 1692c(c)(2), which would prohibit collectors from sending noncoercive settlement offers as a remedy, is "plainly at variance with the policy of the legislation as a whole." *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940). To hold that a debt collector cannot offer payment options as part of an effort to resolve an outstanding debt, possibly without litigation, would force honest debt collectors seeking a peaceful resolution of the debt to file suit in order to advance efforts to resolve the debt—something that is clearly at odds with the language and purpose of the FDCPA. Nothing ACB did in its June 3rd letter can be construed as an abusive collection practice. It simply offered to settle Lewis's debt without litigation. Allowing debt collectors to send such a letter is not only consistent with the Act but also may result in resolution of the debt without resorting to litigation, saving all parties involved the needless cost and delay of litigation as is exemplified by this very case. And it is certainly less coercive and more protective of the interests of the debtor. Moreover, while ACB's letter could have more clearly expressed its character as a notice of a normally invoked remedy had it included other typically invoked remedies, such as filing a lawsuit, nothing in the statute requires that the letter give notice of all of the remedies normally invoked by debt collectors, and the statute does not require that a debt collector invoke any specific type of remedy. Rather, it allows the debt collector to notify the consumer of remedies *it* normally invokes. The record in this case clearly demonstrates that ACB did just that.[8]

■ Additionally, we are unpersuaded by Lewis's argument that the Federal Trade Commission's statement on § 1692c(c) is dispositive. Initially we note the limited precedential value of FTC pronouncements regarding the FDCPA in light of the restricted scope of its power under the Act. FTC advisory opinions regarding the FDCPA are entitled to deference only to the extent that their logic is persuasive. *See Pressley v. Capital Credit & Collection Serv.*, 760 F.2d 922, 925 & n. 2 (9th Cir.1985); *Fox v. Citicorp Credit Servs., Inc.*, 15 F.3d 1507, 1513 n. 4 (9th Cir.1994); *Dutton v. Wolpoff & Abramson*, 5 F.3d 649, 654 (3d Cir.1993). More important, however, we find nothing in the FTC's policy statement that is inconsistent with our position. The June 3rd letter simply gave Lewis "an opportunity to pay [the] debt" though various payment plans. We therefore do not view it as an impermissible demand for payment.

■ We note that the mere fact that the letter states at the bottom that it "is an attempt to collect a debt" does not transform the letter into an unlawful demand for payment. On the contrary, such a statement is required by the FDCPA. *See* 15 U.S.C. § 1692e(11) (1987) ("the failure to disclose clearly in *all* communications made to collect a debt or to obtain information about a consumer, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose" is a violation of the FDCPA) (emphasis added).[9] Given the fervor with which Lewis seeks to

---

**8.** Our conclusion is bolstered by the fact that, since a debt collector legitimately can tell a debtor that it ordinarily sues or recommends suit as a remedy, it is certainly within the purpose of the Act to allow a debt collector to make a truthful statement that various payment plans are available. *Cf. United States v. American Trucking Ass'ns*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940) (courts' power in interpreting statutes is not limited to a "superficial examination" of particular statutory text, but rather includes power to effectuate underlying purpose of statute as inferred from the text of the statute as a whole).

**9.** Section 1692e(11) was amended in 1996. It now provides that in subsequent communications with the consumer the debt collector need only state that the communication is from a debt collector. The amendment, however, is not relevant to our analysis since ACB was attempting to comply with the requirements of the Act as it appeared when it sent the letter to Lewis.

protect his rights under the FDCPA, he certainly would have called foul had this communication not included this necessary language. For example, we recently decided a case in which a plaintiff, also represented by Lewis's attorney, appealed from an award of attorney fees. In that case, the plaintiff suggested that a letter sent by a collection agency that failed to include language that the "debt collector is attempting to collect a debt ... [and that] any information obtained will be used for that purpose" gave rise to a § 1692e(11) violation. *See Lee v. Thomas & Thomas,* 109 F.3d 302 (6th Cir.1997). The debt collector settled and as a result we did not decide the issue of whether the failure to include such language violates that act. But given Lewis's choice of counsel, it is likely that had ACB failed to include such a statement in its letter, Lewis would have brought an additional FDCPA claim based on ACB's failure to include the statutory language. To punish ACB for compliance with this provision just because the remedy letter states that it is an "attempt[ ] to collect on a debt" would be an absurd result that we decline to reach.

B. *Use of the pseudonym "M. Hall"*

■ Next, Lewis argues that ACB's use of the pseudonym "M. Hall" violates § 1692e(10) because its reference to a nonexistent individual is deceptive. He argues that the letter "is replete with 'I' and 'Me', indicating that a 'Payment Supervisor' by the name of 'M.Hall' exists and is giving the account personal attention[, when i]n fact, the designation 'M.Hall' is a code that Defendant uses to alert its collectors and telephone operators." Appellant's Brief at 25. This is deceptive, he claims, because ACB "not only makes consumers believe that an individual by the name of 'M.Hall' has an office where he or she is making a 'FINAL REVIEW,' but also uses the unwitting consumer to divulge information concerning the consumer's communication." *Ibid.* In essence, he argues that, simply by asking for "M. Hall," the consumer unknowingly discloses important information, such as the status of the account, to the debt collector at the other end of the phone. This, he argues, is a deceptive practice under the FDCPA. We disagree.

■ The FDCPA prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Section 1692e is broken into sixteen subsections, which provide a non-exhaustive list of prohibited practices. Subsection 1692e(10), at issue in this case, specifically prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." In determining whether a debt collector's practice is deceptive within the meaning of the Act, courts apply an objective test based on the understanding of the "least sophisticated consumer." *Bentley v. Great Lakes Collection Bureau,* 6 F.3d 60, 62 (2d Cir.1993). Even with the least sophisticated consumer in mind, we do not believe that ACB's use of "M. Hall" was deceptive.

Rather, we believe this situation is analogous to the use of an alias by the debt collector in *Johnson v. NCB Collection Services,* 799 F.Supp. 1298 (D.Conn.1992), even though the alias used in *Johnson,* "Althea Thomas," was assigned to a specific individual. This is because in *Johnson* the court found that a consumer asking for "Althea Thomas" was not automatically referred to that individual. Rather, the debt collector would refer the consumer to the next available representative and the consumer was not even told that the person he or she was speaking to was not the "true" pseudonymous "Althea Thomas." The court held that such a use of an alias was not a deceptive practice:

> While an allegedly deceptive practice is to be evaluated with reference to the effect on the least sophisticated debtor, it is clear to anyone (including the least sophisticated debtor) that a specific representative named in a collection mailing cannot and will not always be available 24 hours per day, 7 days per week. Therefore, no deception occurs even if the answering representative fails to offer that he or she is not "Althea Thomas." The use of an assigned alias or office name, even when considered from the standpoint of the least sophisticated debtor, does not misrepresent the

amount of a debt, the consequences of its non-payment, nor the rights of the contacted debtor. Indeed, at oral argument plaintiff's counsel was unable to adduce any prejudice or harm suffered as a result of the use of the alias in this case. Aliases and office names in fact have long been utilized by collection agencies for the protection of their employees. The burden to an ethical debt collector that would result from prohibiting the use of assigned aliases by designated employees clearly outweighs any abstract benefit to the debtor that such a prohibition might yield. *Id.* at 1304 (citation omitted). Here, as in *Johnson,* Lewis can show no prejudice or harm suffered as a result of the use of the alias "M. Hall." The only person notified of his account status through his reference to "M. Hall" was ACB—which *a fortiori* was already was aware of it. The consumer only discloses to ACB that the debtor has written a cease-communication letter and has been sent a final communication, indicating that the consumer may wish to pay off the debt using a payment plan. Not only is this not deceptively drawing out information from the consumer, but also it ensures that the agent to whom the consumer is referred will not attempt to resume collection efforts.

Moreover, we are unpersuaded by Lewis's attempt to analogize this case to the situation in *Bentley,* 6 F.3d at 60. This case is clearly distinguishable from *Bentley,* in which the Second Circuit found a letter to be a deceptive practice under the Act. The letter in *Bentley* indicated that Bentley's account had been referred to the desk of a particular decisionmaker, even though the account had never received personal attention from anyone at the collection agency. The letter to Bentley made several affirmative misrepresentations, including that her account was receiving personal attention and that someone had unsuccessfully attempted to contact her. Lewis's account, by contrast, had been assigned to a specific individual. It is of no moment that that individual was not specifically assigned the alias "M. Hall." Additionally, it is clear from the record that Lewis's account actually received personal attention, and that the letter was in no other respect deceptive.

## C. *The bona fide error defense*

We are also unpersuaded by Lewis's argument that the district court erred in entering judgment as a matter of law against him on his FDCPA claim because ACB had contacted him on July 8, 1994, in violation of 15 U.S.C. § 1692c. Contrary to Lewis's position, we believe that ACB has established beyond dispute that its actions meet the requirements of the bona fide error defense. In order to prove a bona fide error defense, a collector must show that the "violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). ACB has done just that.

If anything, this case presents even stronger evidence to support the bona fide error defense than the evidence we found sufficient in *Smith v. Transworld Systems, Inc.,* 953 F.2d 1025, 1031 (6th Cir.1992). In *Smith,* this court found that a collection letter mailed shortly after receiving the consumer's cease-communication letter constituted a bona fide error. In support of its defense, the defendant in *Smith* introduced an employee's procedural manual and two employee affidavits, which showed that the error was at most a clerical error. ACB in this case is not even responsible for committing a clerical error; it was Amex, and not ACB, that made the critical coding error before the file was returned to ACB.

We also believe that ACB's manual and computer systems were "reasonably adapted" to avoid the error that occurred in this case and in fact were able to catch the error in a very short period of time. Ms. Schohan, one of ACB's FDCPA compliance officers, caught this mistake in time to prevent the computer-generated letter from being sent even if she was unable to stop the phone call. Contrary to Lewis's claim that the ACB agent's July 8th telephone call demonstrates ACB's intent to resume collection efforts, in fact it shows that the only reason ACB's agent contacted Lewis was because he believed that Lewis's account was new. This is simply not enough to show that ACB in-

tended to resume collection efforts in violation of the FDCPA. Inherent in Lewis's argument is a flawed understanding of the intent requirement of § 1692k(c). The debt collector must only show that the violation was unintentional, not that the communication itself was unintentional. To hold otherwise would effectively negate the bona fide error defense.

### III

Lewis also argues that the district court used an incorrect legal standard in denying his motion to compel ACB to produce the remainder of the contract between it and Amex. He contends that the contract itself would have been admissible evidence because at trial employees of ACB referred to the agreement to support its case. He also contends that he made an offer of proof when requesting the document be produced that showed that the contract supported the argument that ACB, under its contract with Amex, was not authorized to collect from supplemental cardholders. Further, he argues that the contract could have led to admissible evidence because the contract controls ACB's collection activities and "could lead to collection activities required to be made by Defendant but not noted in its collection notes." Appellant's Brief at 33. Again we find no error.

The scope of discovery is, of course, within the broad discretion of the trial court. *Ghandi v. Police Dep't of Detroit,* 747 F.2d 338, 354 (6th Cir.1984), *appeal after remand,* 823 F.2d 959 (6th Cir.1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 861 (1988). "An order denying further discovery will be grounds for reversal only if it was an abuse of discretion resulting in substantial prejudice." *Ibid.*

The scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad. *See Mellon v. Cooper–Jarrett, Inc.,* 424 F.2d 499, 501 (6th Cir.1970). "The scope of examination permitted under Rule 26(b) is broader than that permitted at trial. The test is whether the line of interrogation is reasonably calculated to lead to the discovery of admissible evidence." *Ibid.* (ci-

tation omitted); *see also Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 2389–90, 57 L.Ed.2d 253 (1978). However, "discovery of matter not 'reasonably calculated to lead to the discovery of admissible evidence' is not within the scope of Rule 26(b)(1). Thus, it is proper to deny discovery of matter that is relevant only to claims or defenses that have been stricken, or to events that occurred before an applicable limitations period, unless the information sought is otherwise relevant to issues in the case." *Id.* at 351–52, 98 S.Ct. at 2390 (quotation omitted).

Lewis's first argument—that the requested documents could have been used as evidence to show that ACB could not attempt to collect from supplemental cardholders—is baseless. That claim was dismissed by the district court because it was outside the pleadings; moreover, the court found that "any attempt to amend after the close of plaintiff's evidence to plead such a claim was unfairly prejudicial to Defendant." *Lewis v. ACB Bus. Servs., Inc.,* 911 F.Supp. 290, 293 (S.D.Ohio 1996). Further, the district court found that such a claim had not been tried by consent of the parties and was barred by the statute of limitations. *Ibid.* We find no abuse of discretion by the district court in denying discovery of the remainder of the agreement based on this asserted purpose, as this issue was no longer relevant in the Dayton case.

We also do not believe that the district court abused its discretion in finding that the document was not relevant to any of the issues remaining in the case. For one thing, Lewis never disputed that he owed the debt. And there was never any dispute that ACB had sent the June 3rd letter. Thus, questions of whether ACB sent Lewis the letter pursuant to a contract with Amex or whether ACB acted outside the terms of any contract it may have had with Amex had no relevance to whether ACB's activities at issue in the Dayton case were a violation of the FDCPA or the OCSPA. Likewise, the statements made by employees of ACB at trial mentioning an agreement between ACB and Amex were simply made in passing and did not make the contract relevant to the issues

in the Dayton case.[10] These statements simply explained why Lewis's file was again sent to ACB after the suit was filed. Thus, the district court's denial of Lewis's motion to compel production of the contract between ACB and Amex was not an abuse of discretion.

## IV

Lewis's final assignment of error in the Dayton case is that the district court erred in finding that ACB's conduct did not violate Ohio Rev.Code §§ 1345.02(A) and 1345.03(A).[11] He argues that the district court erred in granting ACB's motion for judgment as a matter of law on his OCSPA claims in that (1) the district court failed to set forth specific findings of fact and conclusions of law; (2) the district court erred in denying him the opportunity to present evidence of damages concerning his OCSPA violations; and (3) the district court construed the application of prior decisions to his OCSPA violations too narrowly. Once again, we find no merit in Lewis's arguments.

A. *Failure of the district court to set forth specific findings of fact and conclusions of law*

■ While Lewis correctly notes that the court's opinion regarding his OCSPA claims does not go through each alleged violation point by point, we believe that the court's opinion provides sufficient findings of fact and conclusions of law to support its decision. The district court fully detailed the actions alleged to have violated the FDCPA and the OCSPA. Thus, it did not need to set out separate facts for its OCSPA discussion because, as admitted by Lewis, he did not put on any additional evidence relevant to his OCSPA claims. Furthermore, the court fully detailed its reasons for rejecting Lewis's FDCPA claims. While it is true that the OCSPA could have been violated independently, he did not provide any additional evidence to sustain those claims. He simply relied on the asserted violations of the FDCPA to support his OCSPA claims. Given that the district court correctly determined that no FDCPA violation had occurred, we believe that the district court's opinion sufficiently addresses Lewis's OCSPA claims.

B. *Failure to provide an opportunity for Lewis to present evidence of damages concerning the OCSPA violations*

■ Next, Lewis argues that the district court erred in failing to provide him the opportunity to present evidence concerning his actual damages regarding his claim that the February 23rd collection letter, which failed to inform the reader of the writing on the reverse side, the attempts to contact a supplemental cardholder, and the phone calls to neighbors regarding his debt, violated the OCSPA. He argues that the damage evidence was "likely excluded" because of confusion regarding the different statute of limitations for the OCSPA and the FDCPA.[12] He also contends that the district court "compounded the error by finding that [his] attempts to prove actual damages ... failed

---

10. Lewis points to a statement made by Mark Nakon in which he said that the request for the file to be returned to ACB after Lewis had filed a lawsuit was the result of the collection contract between Amex and ACB. The second statement appears to be a statement made by Schohan that the contract controls ACB's collection activities. These statements do not bear on whether the June 3rd letter or the July 8th phone call violated the FDCPA or OCSPA.

11. Section 1345.02(A) provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

Section 1345.03(A) provides that "[n]o supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." Although the OCSPA does not expressly address debt collection practices, Ohio courts have applied the OCSPA to such practices. *See Liggins v. May Co.,* 44 Ohio Misc. 81, 337 N.E.2d 816 (Ohio C.P. Cuyahoga County 1975).

12. The OCSPA statute of limitations is two years. Ohio Rev.Code § 1345.10(C). The FDCPA statute of limitations is one year. *See Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7th Cir. 1997).

under both statutes.... In other words, the Trial Court disallowed Lewis from presenting the full panoply of his damages, then stated that the evidence of damages by Lewis was insufficient *as a matter of weight and credibility* to support an award." Appellant's Brief at 40 (emphasis in original). This argument is unpersuasive.

First, the district court did not exclude the claims relating to the February 23rd letter, the alleged phone calls by ACB to Lewis's neighbors, and the supplemental card holder simply because the statute of limitations under the FDCPA had run. Rather, the court found that Lewis had proved no damages proximately caused by the February 23rd letter. Moreover, the court found that the claims regarding contacts with supplemental cardholders and Lewis's neighbors were outside the pleadings.

In addition, the district court fully explained why Lewis had failed to prove actual damages under both statutes:

> Mr. Lewis's attempts to prove actual damages also failed under both statutes. He did not attempt to prove any "economic" damages. Rather, he asserted he suffered mental distress resulting in headaches, indigestion, and fitful sleep throughout the period of ACB's attempted collection and continuing up to the time of trial. He offered no medical evidence and admitted that he had not seen a physician for any of the claimed ills, but had self-medicated with aspirin and Tums. The debt involved here is over $14,000. During 1994 Mr. Lewis admittedly had somewhere in the vicinity of $50,000 unpaid credit card debt outstanding. He had extensive negotiations with Amex over this particular debt and became involved in at least three lawsuits relating just to this debt. Even assuming that the efforts of ACB to collect the debt added to his distress, he offered no competent testimony linking his distress to those parts of ACB's efforts which he challenged as unlawful, as compared to, for example, his admitted upset that the case had been referred to a collection agency at all despite his ongoing conversations with Amex. Mr. Lewis could not remember either at deposition or trial, any

details of any correspondence he received from ACB, yet his trial position was that the FDCPA violations were in the details. Mr. Lewis had so little recollection of the July 8, 1994, telephone call, which lasted less than a minute, that he had remembered it as coming from a woman at 8:00 a.m. on a Sunday, whereas the proof showed that it occurred around 10:30 a.m on a Friday and the caller was male. This is not an adequate factual basis for an award of mental distress damages.

*Lewis,* 911 F.Supp. at 295–96.

### C. *The district court's construction of prior decisions*

Additionally, Lewis claims that the district court erred in concluding that ACB "was not exposed to treble actual damages or $200 in statutory damages, pursuant to § 1345.09(B) of the OCSPA." Appellant's Brief at 41. Again, we find no merit in this argument.

Ohio Rev.Code § 1345.09(B) provides for treble actual damages or $200 in statutory damages:

> [W]here the violation was an act or practice declared to be deceptive or unconscionable by ... an act or practice determined by a court of this state to violate section 1345.02 or 1345.03 of the Revised Code and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of section 1345.05 of the Revised Code....

Under section 1345.05(A)(3) of the OCSPA, the Ohio Attorney General is directed to make available for public inspection all judgments and opinions by courts of Ohio "determining that specific acts or practices violate section 1345.02 or 1345.03 of the Revised Code."

Lewis relies on two opinions made available by the Ohio Attorney General pursuant to § 1345.05(A)(3) to support his claim that he was entitled to treble damages, *Liggins v. May Company,* 53 Ohio Misc. 21, 373 N.E.2d 404 (Ohio C.P. Cuyahoga County 1977), and *Brown v. Lyons,* 43 Ohio Misc. 14, 332 N.E.2d 380 (Ohio C.P. Hamilton County 1974). He argues that *Liggins* supports his claim for treble damages because in *Liggins*

the court found that the debt collector's *"false statements of fact,* false statements or implications about what [would] happen if the consumer fail[ed] to satisfy the claim, and misrepresentations about the law," violated the OCSPA. Appellant's Brief at 43 (quoting *Liggins,* 373 N.E.2d at 405) (emphasis in brief). He claims that this language in *Liggins* put ACB on notice that its actions relative to his account would violate the OCSPA. He also argues that *Brown* supports his claim for treble damages because in that case, "the court found that a supplier must comply with its legal obligations, must not knowingly make a misleading statement, and cannot continually stall or evade its legal obligations." Appellant's Brief at 43. We disagree.

In *Liggins,* the court held that the collection agency committed deceptive and unconscionable acts and practices in sending collection notices that were designed to simulate official documents and misrepresented the pendency or immanency of official or judicial action. The letters were also found to contain false statements or implications about what would happen if the consumer failed to satisfy the claim. In addition, the communications made misrepresentations about the law. Thus, the actions in *Liggins* were far more outrageous than anything ACB allegedly did.

Lewis's reading of *Brown* is equally flawed. In *Brown,* the court rendered a number of conclusions of law at the behest of the Ohio Attorney General who had brought the case. Contrary to Lewis's position, there is nothing in this case similar to the facts in *Brown:* ACB never attempted to avoid its legal obligation to Lewis, never engaged in a pattern of inefficiency, incompetency, stalling or evasion, and never made any misleading statements of opinion. *See Brown,* 332 N.E.2d at 383–84. To read *Liggins* and *Brown* as broadly as Lewis suggests and without reference to the specific acts in those cases would allow the recovery of treble damages or the $200 in statutory damages under the OCSPA whenever there is any arguable misstatement of fact, a result the Ohio courts and legislature surely did not intend.

**V**

We next turn our attention to Lewis's claims of error in the Cincinnati case. Lewis raises several issues on this appeal as well. He argues that the district court erred in (1) dismissing his ECOA claim; (2) granting Connors's motion for summary judgment based solely on his affidavit; (3) finding that ACB did not illegally interpose itself between Connors and Amex; (4) finding that Amex is not a debt collector for purposes of the FDCPA; (5) dismissing with prejudice Lewis's OCSPA claims; and (6) denying his motion for reconsideration of his motion to move venue back to Cincinnati. We address the issues in the order presented.

Lewis argues first that the district court made two errors when granting defendants' motion to dismiss his ECOA claims: (1) holding that the filing of the state lawsuit by Amex was not discrimination under 15 U.S.C. § 1691, and (2) holding that ACB and Connors are not "creditors" under the ECOA. We find no reversible error in these rulings.

 Initially we note that a dismissal of a complaint for failure to state a claim is subject to de novo review and all factual allegations are taken as true. *Mayer v. Mylod,* 988 F.2d 635, 637–38 (6th Cir.1993). " '[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' The fundamental purpose of pleadings under the Federal Rules of Civil Procedure is to give adequate notice to the parties of each side's claims and to allow cases to be decided on the merits after an adequate development of the facts." *Id.* at 638 (citation omitted). Only well-pleaded facts, however, must be taken as true. The trial court need not accept as true legal conclusions or unwarranted factual inferences. *See Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987). Moreover, "[t]he admonishment to liberally construe plaintiff's claim when evaluating a Rule 12(b)(6) dismissal does not relieve a plaintiff of his obligation to satisfy federal notice pleading requirements and allege more than bare assertions of legal conclusions." *Sogevalor v. Penn Cent. Corp.,* 771

F.Supp. 890, 893 (S.D.Ohio 1991). "[A] complaint ... must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Ibid.* (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985)).

## A. *Lewis's ECOA claim against Amex*

Lewis argues that the district court erred in finding that Amex had not discriminated against him when it filed the state suit to recover on the debt, in violation of 15 U.S.C. § 1691(a)(3). He claims that ACB had requested the file back from Amex for the "express purpose of filing the state court action against Mr. Lewis," thereby discriminating against him. Appellant's Brief at 15. "In fact," he claims, "the lawsuit against [him] was the first time Defendant ACB had ever hired an attorney to file suit on behalf of Amex in Ohio." *Id.* at 16. We are unpersuaded by Lewis's argument.

▮ The ECOA prohibits discrimination in the extension of credit: "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction ... because the applicant has in good faith exercised any right under this chapter." 15 U.S.C. § 1691(a)(3). The legislative history of the Act indicates that § 1691(a)(3) was "intended to bar retaliatory credit denials or terminations against applicants who exercise their rights under any part of the Consumer Credit Protection Act ... The 'good faith' qualification [also] recognizes[, however,] that some applicants may engage in frivolous or nuisance disputes which do reflect on their willingness to honor their obligations." Equal Credit Opportunity Act Amendments of 1976, Pub.L. No. 94–239, 1976 U.S.C.C.A.N. 403, 407. The Act was only intended to prohibit credit determinations based on "characteristics unrelated to creditworthiness." It was never intended to eliminate a "creditor's right to make a rational decision about an applicant's credit worthiness." *Id.* at 404–05. Thus, an ECOA violation cannot be shown by simply alleging that the creditor is attempting to collect on the debt. Rather, "[i]n determining the exis-

tence of discrimination ... courts ... [should] look at the effects of a creditor's practices as well as the creditor's motives or conduct in individual transactions ... [and] judicial constructions of anti-discrimination legislation in the employment field ... are intended to serve as guides in the application of th[e] Act, especially with respect to the allocations of burdens of proof." *Id.* at 406.

▮ Because the history suggests reviewing ECOA claims of discrimination using the same framework and burden allocation system found in Title VII cases, we adapt the burden allocation framework used in retaliation-based employment claims to Lewis's ECOA claim. Thus, in order for Lewis to make out a prima facie case of retaliation, he must allege facts sufficient to show that (1) he engaged in a statutorily protected activity; (2) suffered an adverse credit action; and (3) a causal connection exists between the two. *See Johnson v. United States Dep't of Health and Human Servs.*, 30 F.3d 45, 47 (6th Cir. 1994). Lewis is simply unable to make such a showing.

The ECOA defines "adverse action" as:

a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested. Such term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit.

15 U.S.C. § 1691(d)(6). It also does not include "*[a]ny action* or forbearance relating to an account taken *in connection* with inactivity, *default, or delinquency* as to that account." 12 C.F.R. § 202.2(c)(2)(ii) (emphasis added).

Although Lewis filed an FDCPA claim against ACB in the Dayton case, he is unable to show that he suffered an adverse action because the ECOA does not cover "any action ... relating to an account taken in connection with .... default[ ] or delinquency." 12 C.F.R. § 202.2(c)(2)(ii). Lewis's complaint shows nothing more than a creditor taking a

necessary action to recover thousands of dollars in undisputed debt that the consumer refuses to honor. Amex is certainly entitled to sue Lewis under such a circumstance, and Lewis's attempt to argue otherwise amounts to nothing more than bare legal conclusions and unwarranted factual inferences.[13]

Lewis's complaint also fails to show a causal connection between the Dayton suit and Amex's suit against him in state court. His attempts at showing a retaliatory motive on the part of Amex once again amount to nothing more than unwarranted factual inferences and legal conclusions that are insufficient to state a claim of retaliation. To allow a claim to be stated any time a consumer makes an unwarranted factual inference or bare legal conclusion of retaliation in response to a creditor's legal action seeking resolution of an undisputed debt would be to create an incentive on the part of consumer to file an ECOA claim against creditors any time the debtor is unable or unwilling to pay on the debt. The ECOA was certainly never intended to act as a shield for consumers refusing to pay their debts.

### B. The district court finding that ACB and Connors are not "creditors"

■ Next Lewis argues that the district court erred by finding that ACB and Connors are not "creditors" within the meaning of the Act. He claims that by simply alleging that they are "creditors" he has met his burden. Further, he claims that "ACB and Connors are creditors because the debt alleg-

edly owed by Mr. Lewis to Defendant Amex was 'continued' by [ACB and Connors].... Thus, Defendants ACB and Connors are creditors in that they are (1) agents of Defendant Amex who 'continued' the credit transaction, or (2) assignees, transferees, or subrogees of Amex' credit transaction with Mr. Lewis." Appellant's Brief at 17–18. Further, he argues that a

[c]reditor "also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom request for credit may be made." The debt allegedly owed by Mr. Lewis to Defendant Amex was referred by defendants ACB and Connors to Defendant Amex for consideration of further credit. In fact, Defendants ACB and Connors solicited payment arrangements with Mr. Lewis regarding the debt allegedly owed by Mr. Lewis, which constitutes a credit transaction under the ECOA.

*Id.* at 18.

Under the Act, the term "creditor" is defined as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e). The term also includes "a creditor's assignee, transferee, or subrogee who participates in the decision of whether or not to extend credit." 12 C.F.R. § 202.2(*l*). And for purposes of §§ 202.4 [14]

---

**13.** Lewis's complaint provides in relevant part:

17. On October 14, 1994, Defendant Amex purportedly filed in the Court of Common Pleas, Franklin County, Ohio, case number 94 CVH 10–7274 against Mr. Lewis. The state court case alleges that Mr. Lewis owes a debt to Defendant Amex.

18. Defendant Amex did not directly file the state court lawsuit. Rather, Defendant ACB filed the state court lawsuit on behalf of Defendant Amex. Defendant ACB filed the state court lawsuit pursuant to an assignment controlled by a collection agreement between Defendant ACB and Defendant Amex.

19. Defendant Connors filed the state court lawsuit purportedly as the attorney for Defendant Amex.

20. Defendant Connors also was the attorney for Defendant ACB in the federal court lawsuit brought by Mr. Lewis.

....

24. Defendant ACB filed the state court lawsuit in retaliation for Mr. Lewis having filed this federal court lawsuit against Defendant ACB, violating ECOA section 1691(a)(3), FDCPA section 1692e(5), and OCSPA sections 1345.02–1345.03.

....

26. Defendant Amex knew that the state court lawsuit against Mr. Lewis was made in retaliation for Mr. Lewis' federal court lawsuit and thereby violated ECOA section 1691(a)(3).

**14.** That provision provides that "[a] creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction."

and 202.5(a) [15] "the term also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made." *Ibid.*

Connors clearly is not a "creditor" within the meaning of the Act. On its face, Lewis's complaint contains nothing more than a bare legal conclusion in an attempt to show that Connors regularly extended, renewed, or continued credit or regularly arranged for the extension, renewal, or continuation of credit.[16] The complaint also does not provide facts to show how Connors is an assignee of Amex. At best, Lewis appears to suggest that because Connors offered to settle the case, he has in some sense extended an offer of credit to Lewis.[17] This is certainly not enough to make someone a creditor under the act. Otherwise, an attorney would be a creditor under the ECOA anytime the attorney offered to settle a case.

ACB is also not a "creditor" within the meaning of the act. Again, Lewis has failed to provide anything more than a bare legal conclusion to show that ACB regularly extends, renews, or continues credit or that ACB participates in any way in the decision to extend credit. Rather, the record shows that ACB was simply attempting to collect on a debt that resulted from Amex's decision to extend credit. Additionally, even were ACB a "creditor" under the act, Lewis's claim would fail. He has failed to state any claim that ACB independently violated the

ECOA and, as discussed above, Lewis has failed to state an ECOA claim against Amex, so any ECOA claim against ACB as an agent or "assignee, transferee, or subrogee" of Amex must also fail.

## VI

Next, Lewis argues that the district court erred in dismissing his FDCPA claims against ACB, Amex, and Connors. He argues that the district court, "[w]ithout allowing any discovery to go forward, ... makes three disjointed factual and legal findings concerning the FDCPA: (1) defendant Connors is not a debt collector, (2) Defendant ACB did not interpose itself between defendants Connors and Amex, constituting the unauthorized practice of law, and (3) Defendant Amex is not a debt collector." Appellant's Brief at 19–20. Again, we find no reversible error.

### A. *Connors as a debt collector within the meaning of the FDCPA*

First, Lewis argues that the district court erred in granting Connors's motion for summary judgment, holding that Connors was not a debt collector. Lewis argues that the district court simply relied on Connors's affidavit and that he should have been allowed to continue discovery pursuant to his Rule 56(f) motion because such discovery would have shown that Connors is a debt collector as defined by the FDCPA.[18] This argument is without merit.

15. That provision provides that "[a] creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application."

16. Lewis's complaint simply provides that "Defendant Connors is a 'debt collector' as defined by FDCPA section 1692a(6), a 'supplier' as defined by OCSPA section 1345.01(C), and a 'creditor' as defined by ECOA section 1691a(e)." Joint Appendix at 19, ¶ 10.

17. Lewis claims that an exhibit to his memorandum in opposition to defendants' motion to dismiss his complaint shows that defendants offered to give him "consideration for a new credit card." The letter to which Lewis appears to be referring is a letter sent by his *own* attorney offering to settle the case. One of the terms of

the settlement was for Amex to reconsider Lewis "as a card holder immediately after the $7,500 is paid." This settlement offer was never accepted by defendants.

18. A debt collector is defined as:

any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another....

15 U.S.C. § 1692a(6). The Supreme Court has held that the FDCPA applies to lawyers who "regularly" try to obtain payment of consumer debts through legal proceedings. *Heintz v. Jenkins*, 514 U.S. 291, 296–98, 115 S.Ct. 1489, 1492, 131 L.Ed.2d 395 (1995).

A motion for summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989). Once the movant has met his initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If the nonmoving party is unable to make such a showing, summary judgment is appropriate. *Emmons*, 874 F.2d at 353.

 A party opposing a motion for summary judgment may file a motion for additional time for discovery under Rule 56(f). That party, however, has no absolute right to additional time for discovery, and this court reviews the denial of a rule 56(f) motion for an abuse of discretion. *Id.* at 356. Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Rule 56(f), however, "is not a shield that can be raised to block a motion for summary judgment without even the slightest showing by the opposing party that his opposition is meritorious." The nonmoving party must show how postponement of a ruling on the motion will enable him to rebut the motion for summary judgment. *Emmons*, 874 F.2d at 356.

Lewis's claims against Connors were that (1) he violated the FDCPA by filing the state case as Amex's attorney because he knew that the state case was in retaliation for Lewis having filed the Dayton case and (2) Connors violated the FDCPA by filing the state action in the improper venue. *See* 15 U.S.C. § 1692i (directing where a debt collector may bring an action against a consumer).

 Connors's affidavit proves that, although he has been involved in cases where money damages and alleged debts are disputed, he has never brought any action exclusively on behalf of a creditor client with the purpose of collecting a consumer debt, that he has never had a practice which consisted of debt collection on behalf of creditors, and that the overwhelming portion of his practice has been as a defense attorney. This affidavit, without evidence from Lewis creating an issue of material fact regarding Connors's practice, establishes that he is not a "debt collector" under the FDCPA because he is not a lawyer who "regularly" tries to obtain payment of consumer debts through legal proceedings. *See Heintz*, 514 U.S. at 291–94, 115 S.Ct. at 1489.

We believe that the district court did not abuse its discretion in refusing to give Lewis additional time for discovery as to Connors's practice. Lewis had ample opportunity to conduct discovery in the Dayton case, including discovery after Amex had filed the state court action. For example, he has taken depositions of two different representatives of ACB since the start of the state court proceeding, and in the Dayton case, he has cross-examined witnesses regarding the debt collection activities of ACB, including what happened after Mr. Lewis's account was returned to it. Further, the district court provided Lewis with an additional 10 days to respond to Connors's motion for summary judgment. This gave Lewis ample time to, at a minimum, discover some evidence regarding Connors's practice to support his motion for additional time pursuant to Rule 56(f).

Additionally, while Lewis's motion for additional discovery asserts that "[d]efendants and their witnesses are in exclusive control" of the evidence, Lewis's Rule 56(f) motion and supporting affidavit provide nothing more than bare allegations to support this claim. *See Emmons*, 874 F.2d at 356 (the "district court did not abuse its discretion in denying additional discovery because the affidavit in support of a Rule 56(f) motion asserted nothing more than bare allegations").

The attached affidavit simply states that Connors "is a 'debt collector' as defined by FDCPA section 1692a(6)." Such an allegation without a shred of supporting proof is insufficient to support a Rule 56(f) motion, especially since a simple investigation could have easily uncovered some evidence concerning Connors's practice. And, although Lewis claims that the lack of specificity is due to the fact that the evidence is exclusively controlled by defendants, Lewis could have obtained at least some information regarding Connors's practice without relying on defendants for that information. *See ibid.* (Plaintiff's allegations did not hinge on information under the defendant's control). As it is, the affidavit simply does not provide the "slightest showing ... that his opposition is meritorious." *Emmons,* 874 F.2d at 356. And it certainly does not provide enough evidence for this court to conclude that the district court abused its discretion in denying his Rule 56(f) motion.

### B. *ACB's actions as unauthorized practice of law*

 Next, Lewis argues that the district court erred when it found that ACB's actions did not constitute the unauthorized practice of law. He claims that ACB engaged in the unauthorized practice of law when it hired Mr. Connors on behalf of Amex, thus interposing itself between Amex and Connors:

> The [Magistrate Judge's] Substituted Report [and Recommendations] finds that Defendant Connors is not alleged to be an employee of Defendants ACB or Amex. Yet the Substituted Report does not divulge the legal significance of this finding. When an agent is acting pursuant to authority, a principal is responsible for the actions of the agent whether the agent is an employee or a contractor. Likewise, the agent is directly liable for its actions pursued on behalf of the principal. Defendant Connors is the agent of Defendant Amex and Defendant ACB in regard to the state court lawsuit against Mr. Lewis. Since Defendant ACB hired Defendant Connors for Defendant Amex, Defendant ACB is the agent of Defendant Amex. The actions of Defendant Connors can be attributed to Defendants ACB and Amex,

and the actions of Defendant ACB can be attributed to defendant Amex.

Appellant's Brief at 26 (citation omitted). Lewis then proceeds to cite several Ohio court cases which he claims support his claim that ACB engaged in the unauthorized practice of law. *See Med Controls, Inc. v. Hopkins,* 61 Ohio App.3d 497, 573 N.E.2d 154 (1989) (collection agency found to have committed the unauthorized practice of law where it had discretion to institute legal action on its own initiative and had the sole authority to "employ counsel of [its] own and separate choosing" and was "responsible for the payment of any and all legal fees incident to said retention"); *United Radio, Inc. v. Cotton,* 61 Ohio App. 247, 22 N.E.2d 532 (1938) (where a collection agency agreed to handle the collection of accounts on a contingent fee basis, action of agency in furnishing an attorney, at its own expense, and filing lawsuits in hope of reimbursement through a larger commission in event of collection constituted the unlawful practice of law); *In re Incorporated Consultants,* 6 Ohio Misc. 143, 216 N.E.2d 912 (Ohio C.P. Cuyahoga County 1965) (an agreement between respondents and owners of promissory notes and accounts receivable which provided that the respondents employed, furnished, and recommended attorneys at law to render legal services was an unauthorized practice of law). Although we have some difficulty following Lewis's convoluted argument, we are convinced that it has no merit.

Although these cases, under different factual circumstances, could support a legal claim that a debt collector has been involved in the unauthorized practice of law by interposing itself between the creditor and the attorney, Lewis has failed to allege any factual basis for such a claim. Thus, this court need not accept this allegation as true. *See Church's Fried Chicken,* 829 F.2d at 12. There is simply no factual basis to support his assertion that ACB, and not Amex, was the party to hire Connors. In fact, the record shows the opposite: Connors signed on behalf of Amex as its attorney in pleadings to the court. Furthermore, Lewis's complaint in no way alleges that ACB, and not Amex, is responsible for paying Connors's fees. The

cases cited by Lewis in support of his claim of unauthorized practice of law by ACB require at a minimum that the firm be responsible for payment of the attorney's fees.[19]

### C. *Amex as a debt collector within the meaning of the FDCPA*

Lewis also argues that the district court "without reasoning" found that Amex could not be a debt collector. He argues that Amex is liable under the FDCPA "for the collection actions of its agents of which it is aware and approves":

> There is no dispute that Defendant ACB requested Mr. Lewis' account back from Defendant Amex for the express purpose of filing the state court lawsuit on behalf of Defendant Amex. A fair inference must be made that, when Defendant ACB communicated with Defendant Amex, Defendant ACB stated the reason for the request, placing Defendant Amex on notice of Defendant ACB's intended actions. Since Defendant Amex returned the account to Defendant ACB, the reasonable inference must be made that Defendant Amex approved of Defendant ACB's retaliatory lawsuit.

Appellant's Brief at 27–28 (citations omitted).

Contrary to Lewis's assertion, Amex is not a debt collector for purposes of the FDCPA. Although it uses interstate commerce and the mails to collect debts, its "principal purpose" is not "the collection of debts." 15 U.S.C. § 1692a(6). Rather, Amex is primarily in the business of extending credit, which is not enough to turn an entity into a debt collector under the Act. *See Meads v. Citicorp Credit Servs., Inc.*, 686 F.Supp. 330, 333 (S.D.Ga. 1988) ("actual creditors—the extenders of credit or bona fide assignees—generally are not subject to the Act ... [unless] the creditor attempts to collect the debt under an assumed name, or if the creditor was assigned the debt after default for the specific purpose of collection"); and *Kempf v. Famous Barr Co.*, 676 F.Supp. 937, 938 (E.D.Mo.1988) ("The definition of 'debt collector' does not include a creditor collecting his own debts so long as the employee acting on behalf of the creditor does not indicate that the employee works for a third person. The creditor will not be deemed a 'debt collector' so long as the employee acts 'in the name of the creditor' by informing the debtor that she is collecting the debt as an employee of the creditor."). Because Amex never attempted to collect the debt under an assumed name in order to collect the debt, it does not fall within the definition of a "debt collector" under the Act.

Moreover, even were Amex a debt collector, its actions did not violate the FDCPA. Lewis's complaint does nothing more than assert bare legal conclusions and unsupported factual inferences to show that Amex's actions were done in retaliation for Lewis having filed the Dayton case. And he has alleged nothing that would show that Amex's actions were somehow "false, deceptive, or misleading" as required by the FDCPA. All Amex has done is either (1) sue Lewis to collect on a legitimate debt or (2) hire ACB to collect on a legitimate debt. Congress has outlawed neither.

### VII

Next, Lewis argues that the district court erred in summarily dismissing his OCSPA claims. He argues that he had no opportunity to address the substance of his OCSPA claims and was not required to do so under the pleading requirements of the federal rules and that any violation of the FDCPA is a violation of the OCSPA. Moreover, he claims error because the OCSPA has "its own independent reach":

> In this case, Defendants' retaliatory lawsuit could be found to be an unfair or unconscionable act or practice under state law. Indeed, the practice of filing of lawsuits in a county other than a consumer's already has been found to violate OCSPA. Since Defendant Connors is a supplier— even if he is not [a] debt collector pursuant to the FDCPA—and since Defendants

---

**19.** Because this case was dismissed for failure to state a claim, we do not address the affidavits of either Connors or Kane, an Amex employee. These affidavits, however, make clear that Amex and not ACB was responsible for and authorized the filing of the state court suit. Furthermore, they indicate that Connors is in no way associated with ACB outside of this case.

Amex and ACB are suppliers and vicariously liable for the actions of their agents, the OCSPA applies to Defendants' unfair, deceptive, and unconscionable collection activities.

Appellant's Brief at 30 (citations omitted). We find no merit in this claim of error either. Because this claim rests on Amex's having filed suit in state court in Columbus, the key to finding liability under OCSPA is whether Amex is a "supplier" within the meaning of the OCSPA, and Amex is simply not a supplier within the meaning of the Act. While the term "supplier" [20] in the OCSPA is broader than the term "debt collector" in the FDCPA, the OCSPA specifically excludes "financial institutions" and "dealers in intangibles." Ohio Rev.Code § 1345.01(A). At a minimum, Amex fits within the definition of a "financial institution" as it lends money when it extends credit. *See* Ohio Rev.Code § 5725.01(A).

 The dismissal of OCSPA claims against ACB and Connors were proper as well. Lewis has failed to state a claim with sufficient specificity to show ACB's independent involvement in the filing of the state court lawsuit or the agency relationship between ACB and Connors with respect to that suit. As previously stated, the trial court need not accept as true unwarranted factual inferences. And while Connors filed the lawsuit as Amex's attorney, nothing alleged suggests that Connors regularly files collection suits as a matter of choice in a jurisdiction other than where the consumer resides or signed the contract in question. *See Celebrezze v. United Research, Inc.,* 19 Ohio App.3d 49, 482 N.E.2d 1260 (1984) (it was unfair or deceptive consumer sales practice in violation of state law for a "supplier" to regularly file collection suits as a matter of choice in a jurisdiction other than where consumer resided or signed the contract in question). Key to a finding of OCSPA liability in *Celebrezze* was the fact that the "suppliers" in that case regularly sued consumers in a distant forum in order to take advantage of their consumers.

## VIII

 Finally, Lewis argues that the district court erred when it denied his motion to reconsider the court's previous order rejecting a change of venue. He argues that by trying the Dayton case separately, consolidation of the cases became one of name only and "nullified any consider[ation] of the common issues of law and fact." He argues that his choice of forum should have been given great weight, and thus, he should have been allowed to change the venue back to Cincinnati. Lewis's argument is again without merit.

 A district court's denial of change of venue is reviewed for abuse of discretion. *See Philip Carey Mfg. v. Taylor,* 286 F.2d 782, 784 (6th Cir.), *cert. denied,* 366 U.S. 948, 81 S.Ct. 1903, 6 L.Ed.2d 1242 (1961).

28 U.S.C. § 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." And a case may be consolidated "[w]hen actions involving a common question of law or fact are pending before the court." Fed.R.Civ.P. 42(a). When consolidating a case, a district court "may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." *Ibid.*

 Cases consolidated under Rule 42(a), however, retain their separate identity. *Patton v. Aerojet Ordnance Co.,* 765 F.2d 604, 606 (6th Cir.1985). And although "consolidation is permitted as a matter of convenience and economy in administration, [it] does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *Johnson v. Manhattan Ry. Co.,* 289 U.S. 479, 53 S.Ct. 721, 77 L.Ed. 1331 (1933). Therefore, it is the district court's

**20.** A supplier is defined as "a seller, lessor, assignor, franchiser, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not he deals directly with the consumer." Ohio Rev.Code § 1345.01(C).

responsibility to ensure that parties are not prejudiced by consolidation. *See* 9 Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2385 (2d ed.1994).

█ While Lewis correctly points out that a plaintiff's choice of forum should be given weight when deciding whether to grant a motion to change venue, this factor is not dispositive. *See DeMoss v. First Artists Production Co.*, 571 F.Supp. 409, 413 (N.D.Ohio 1983). And it is of no import that the cases were treated as consolidated for docketing purposes only. The two cases had to be dealt with separately because Lewis declined plenary magistrate judge jurisdiction in the Cincinnati case. To have allowed any greater consolidation would have prejudiced the parties, since in the later case both parties had not consented to plenary magistrate judge jurisdiction.

The record, moreover, supports the court's finding that Lewis's consolidation and motion for transfer of venue was an attempt to avoid having the cases decided by Magistrate Judge Merz, who Lewis perceived to be unreceptive to his claims.

## IX

For the foregoing reasons, the district court's orders dismissing Lewis's claims against defendants in both the Dayton case and Cincinnati case are **AFFIRMED**.

RYAN, Circuit Judge, dissenting.

I believe the plain language of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692–1692o, requires us to reverse the judgment of the district court. I also think the district court misapplied the standards for deciding motions under Fed. R.Civ.P. 12(b)(6) and 56. Therefore, I must respectfully dissent.

## I.

### The Dayton Case

In finding no violation of the FDCPA, the majority opinion relies heavily on legislative history and other decisional devices that are properly employed when a legislative enactment is vague, obscure, ambiguous, or inher-

ently contradictory. If I thought for a moment that we were free to decide this case on the basis of "legislative history," "Senate Reports," "the purpose behind the [FDCPA]," what "Congress appears to have intended," "Federal Trade Commission advisory opinions," "the policy of the legislation as a whole," and whether ACB's collection practices are "less coercive" than litigation, as the majority apparently does, I might be tempted to sign on to the majority opinion. But I do not, and, therefore, I cannot.

There are very few propositions defining the proper scope of judicial review that are more firmly settled than the rule that when the language of a congressional enactment is clear and unambiguous, courts may not "interpret" or "construe" the meaning of the language of the law by resort to "legislative history," apparent "legislative policy," or "legislative intent," but must simply apply what Congress has said, assigning to the words used in the statute their primary and generally accepted meaning. The FDCPA is such a statute. There is nothing ambiguous, unclear, vague, or inherently contradictory about any of the language of the FDCPA. As a matter of fact, the provisions of the statute are so painfully, some might think annoyingly, even nitpickingly, clear, and impose such unambiguous burdens upon even ethical debt collectors, that it is somewhat understandable that the majority opinion would resort to interpretation and construction to soften some of the harsh effects of the statute.

This case chronicles seemingly benign and ethical collection efforts by an apparently reputable company directed at an unappealing and even infuriating deadbeat debtor. Certainly, Congress did not intend to proscribe the legitimate collection of an undisputed debt, but it is our business to determine what Congress said, not what it probably intended. If this statute is harsh, inflexible, hypertechnical, unforgiving, and unfairly burdensome to debt collectors, and if it sweeps into the ambit of its prohibited practices the acts of the virtuous and the vicious alike, the problem is one for legislative correction, not judicial "interpretation."

The majority opinion acknowledges that the broad and sweeping language of the FDCPA effectively forbids *any* communications by a collector to a debtor in the aftermath of the debtor's cease and desist letter, subject to three narrow exceptions. The three exceptions are that the debt collector may:

(1) . . . advise the consumer that the debt collector's further efforts are being terminated;

(2) . . . notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or

(3) where applicable, . . . notify the consumer that the debt collector or creditor intends to invoke a specified remedy.

15 U.S.C. § 1692c(c)(1)–(3).

The majority opinion acknowledges that the June 3 collection letter ACB sent to Lewis does not literally fall within any one of the three exceptions and, as a matter of fact, explicitly states "THIS IS AN ATTEMPT TO COLLECT A DEBT." But, according to the majority opinion, this plain and unambiguous language "can not be interpreted as a demand for payment" because the statement in the letter that "THIS IS AN ATTEMPT TO COLLECT A DEBT" was included in the letter merely to comply with 15 U.S.C. § 1692e(11), which has since been amended, and which read in relevant part that "the failure to disclose clearly in all communications . . . that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose" is a violation of the FDCPA. But subsection 11 reads:

Except as otherwise provided for communications to acquire location information under section 1692b of this title, the failure to disclose clearly in all communications *made to collect a debt* or to obtain information about a consumer, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose.

15 U.S.C. § 1692e(11) (emphasis added). Therefore, there was no need for ACB to comply with section 11 by declaring that its letter "is an attempt to collect a debt," unless

the letter *was* indeed another "communication[ ] made to collect a debt," rather than one of the three types of notifications excepted from the bar of the statute in section 1692c(c)(1)-(3).

In addition to its puzzling explanation on that point, the majority opinion also mistakenly concludes that ACB's letter "can be construed as a type of settlement offer" and can be read as a notification to "the consumer[, under section 1692c(c)(2),] that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor." That "construction is warranted," the majority opinion concludes, despite that the text of the letter never uses the term "remedy," explicitly declares that the letter "IS AN ATTEMPT TO COLLECT A DEBT," and offers "AN OPPORTUNITY TO PAY THIS DEBT" through "ONE OF THE FOLLOWING PAYMENT ARRANGEMENTS."

The plain language of section 1692c(c)(2) permits a debt collector to notify a consumer of unilateral action the debt collector may take against the consumer, such as filing suit, issuing a prejudgment garnishment, or invoking such other "remedies" as are "ordinarily invoked." 15 U.S.C. § 1692c(c)(2). A letter declaring that "THIS IS AN ATTEMPT TO COLLECT A DEBT" and offering payment plans for doing so, is plainly and obviously not a letter notifying the debtor that the "creditor may *invoke* specified remedies." *Id.* (emphasis added). If it were, then a debt collector, despite receiving a cease and desist notice from the debtor, would never be barred from contacting a consumer to notify him or her that payment of the debt would "remedy" the problem. Witness Mark Nakon testified that the letter to Lewis is similar to letters used by ACB in situations where notice to cease further communications has *not* been received. Indeed the letter is nothing more than an attempt to bargain with Lewis regarding his debt, and is exactly what it says it is: " . . . an attempt to collect a debt." The observations in the majority opinion that "the letter can be construed as a type of settlement offer" and should not be "construed as an abusive collection practice"; that it "may result in reso-

lution of the debt without resorting to litigation"; and "is certainly less coercive and more protective of the interests of the debtor" than costly and time-consuming litigation, are of course entirely beside the point. The letter is not a mere notification of the invocation of remedies ordinarily invoked; it is a debt collection letter, just as it says it is, and its issuance was a violation of the plain language of section 1692e.

Likewise, I must dissent from the majority's refusal to recognize a violation of section 1692e in ACB's use of the alias "M. Hall" in the June 3 letter. Although the use of the alias seems harmless, the plain language of the FDCPA prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(10). The defendants have admitted that there is no such person as "M. Hall." Thus, the letter, which purports to have been sent by a person named "M. Hall" and which utilizes the pronouns "I," "me," and "my" a total of eight times, is a "false and deceptive representation" that it was sent by a person named "M. Hall." The language of the letter and the use of the name "M. Hall" were designed to induce the debtor to believe that a specific individual named "M. Hall" was handling the debtor's case, and would assist him in making arrangements for payment of the debt, when ACB knew, that was not true.

Concededly it is difficult to see the harm caused by this particular deception, but the FDCPA unambiguously proscribes deception in any form, not only in circumstances in which a debt collector or this court might think that the end justifies the means. In all events, to suggest, as ACB does, that using a "desk name" is proper because it has always been done that way, or that no harm has shown to have resulted in this instance, does not excuse compliance with the plain language of the statute; nor does it justify this court in applying basketball's "equitable" maxim of "no harm no foul."

## II.

### The Cincinnati Case

The district court held that Lewis's allegation in the Cincinnati suit, that in filing the state-court collection case in Columbus, Amex violated Lewis's rights under the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691–1691f, does not state an actionable claim under Fed.R.Civ.P. 12(b)(6). Lewis alleged that the collection suit was filed *in retaliation* for his exercising his rights under the FDCPA. The majority opinion holds that the district court correctly dismissed Lewis's ECOA claim because "he is unable to show that he suffered an adverse action because the ECOA does not cover '[a]ny action ... relating to an account taken in connection with ... default[ ] or delinquency.'" (Citing 12 C.F.R. § 202.2(c)(2)(ii).) I disagree.

It is unnecessary to review here the well-settled jurisprudence of this circuit describing the heavy burden cast upon a party who seeks dismissal of a claimant's lawsuit on the basis of Rule 12(b)(6). It suffices to say that ACB's obligation here was to show that Lewis could prove no set of facts in support of his retaliation claims. *Saglioccolo v. Eagle Ins. Co.,* 112 F.3d 226, 228 (6th Cir.1997) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). The burden is onerous, and in my judgment ACB has not carried it.

The ECOA makes it unlawful for any creditor to discriminate against a debtor who has exercised any right under the Consumer Credit Protection Act. *See* 15 U.S.C. § 1691–1691f; 12 C.F.R. Pt. 202. The majority opinion correctly observes that a claim of this sort is analyzed under the burden allocation framework established for Title VII retaliation in employment claims. Consequently, to survive a 12(b)(6) dismissal motion Lewis was required to plead that he (1) engaged in a statutorily protected activity; (2) suffered an adverse credit action; and that (3) there is a causal connection between 1 and 2. *See Johnson v. United States Dep't of Health and Human Servs.,* 30 F.3d 45, 47 (6th Cir.1994). My colleagues think Lewis is "unable to make such a showing" primarily because they think he will be unable to prove that he suffered an adverse action since "the ECOA does not cover '[a]ny action ... relating to an

account taken in connection with .... default[ ] or delinquency.'" My brothers believe that Lewis has pleaded nothing more than a creditor taking a lawful "action to recover thousands of dollars in undisputed debt that the consumer refuses to honor."

I respectfully disagree that the ECOA does not proscribe collection suits against defaulting debtors if such suits are filed for retaliatory purposes.

In the first place, it is clear that the ECOA's definition of an "adverse action" does not determine what constitutes discrimination for purposes of section 1691(a), but rather determines what actions require *notice compliance* under section 1691(d). Section 1691(a)(3) plainly makes unlawful a collection suit filed in retaliation for an FDCPA enforcement action. Whether Lewis could succeed in persuading a fact finder that the Columbus suit was filed for retaliatory purposes is another matter. It is possible, for example, that Lewis could prove that Amex is usually more patient with debtors and that Lewis was only subjected to the Columbus collection suit because he filed the Dayton suit. Lewis's claim would be very similar, for example, to an employment discrimination suit alleging retaliation for the filing of an EEOC charge where the complaining employee has a poor work history.

The district court reasoned that Lewis had *not pleaded* the existence of similarly situated debtors who had not been sued by Amex. But it is not necessary in order to plead a retaliation claim that Lewis plead even more facts than are necessary to establish a *prima facie* case of unlawful retaliation.

The question is not, as the majority apparently thinks it is, whether ACB has the right to sue to collect on a debt; clearly it has. The question is whether Lewis can prove that the suit to collect on the debt was filed in retaliation for exercising his protected right. It may well be that Lewis could not prove the causal connection necessary to prevail on a retaliation charge, yet under Rule 12(b)(6), the inquiry concerns whether Lewis could establish his case under *any* set of facts. To me, it is clear that it is *possible* that he could do so.

There are other conclusions in the majority opinion with which I disagree, but those I have discussed are the most serious, and no useful purpose will be served by elucidating the rest.

I would reverse the judgment of the district court and allow the case to be decided by the trier of fact on the evidence.